UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEHAD ALSHRAFI,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC. and<br>MICHAEL E. BLACKSTONE,<br>　　　　　　　　　Defendants. | Civil Action No.<br>03-10212-WGY |

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendants American Airlines, Inc. ("American" or "American Airlines"), and its pilot, Michael E. Blackstone ("Captain Blackstone"), hereby reply to the Opposition to their motion for summary judgment sought on all Counts of the Complaint filed by the plaintiff, Jehad Alshrafi ("Mr. Alshrafi").

### ARGUMENT

**I.  THERE IS NO GENUINE ISSUE OF MATERIAL FACT SURROUNDING CAPTAIN BLACKSTONE'S DECISION TO DENY BOARDING TO MR. ALSHRAFI.**

　**A.  Mr. Alshrafi's Opposition Ignores the Settled Law Interpreting 49 U.S.C. §44902(b), Which Has Consistently Held that a Pilot's State of Mind is the Seminal Issue in Applying the "Arbitrary and Capricious" Standard.**

Mr. Alshrafi's Opposition is erroneously predicated upon the premise that he can pursue his case notwithstanding the express mandate of Congress that is embodied in Section 44902(b). He attempts to create a genuine issue of material fact by portraying as significant the differences in the recollections of Deputy Marshal Brian Renzi, Customer Service Manager Christine Konevich,

and Captain Blackstone. The differences in recollection are not relevant to the Defendants' motion, and do not create a genuine issue of <u>material</u> fact within the meaning of Fed.R.Civ. P. 56(c), because the only relevant issue is Captain Blackstone's state of mind when he made the decision to deny boarding to Mr. Alshrafi.

The Renzi affidavit, rendered more than two years after the incident, is critical for what it does <u>not</u> say. The affidavit does not state that Marshal Renzi did not unilaterally approach Captain Blackstone and discuss a passenger (who turned out to be Mr. Alshrafi) with him. Nor does the affidavit say that Renzi told Captain Blackstone Mr. Alshrafi's name. Notwithstanding the fact that Mr. Alshrafi's name is probative of absolutely nothing even if Captain Blackstone had known it prior to making his decision,[1] there is not one shred of evidence that he had such knowledge <u>at the time he made his decision</u>. Captain Blackstone did not learn Mr. Alshrafi's name at that point in time, but his testimony is that he had already made an "irrevocable" decision before he learned Mr. Alshrafi's name. Blackstone Deposition at 16-17. Plaintiff has adduced no evidence that Captain Blackstone knew Mr. Alshrafi's name, much less his ethnicity or religion, when he made his decision.

Captain Blackstone testified that he was not informed that the passenger at issue might have an Arabic surname until <u>after</u> his conversation with Marshal Renzi – which conversation made him deny boarding to a passenger later determined to be Mr. Alshrafi. Captain Blackstone recounted this discussion with American's Systems Operations Control ("SOC") in Dallas, when this issue of possible discrimination was expressly raised:

---

[1] Mr. Alshrafi's own deposition testimony provides a telling example. He testified that he had been on the telephone to his sister-in-law, Debbie Alshrafi. When asked to describe her name and relationship to her ethnic background, he testified that prior to her marriage to his brother, her name was Deborah Mann. Alshrafi Depo. at 92. When asked about the significance of Mr. Alshrafi's name, Captain Blackstone testified "I'm not an expert on -- on languages. I'm from southern California. The name meant nothing to me." Blackstone Depo. at 17.

2

> And I advised them [SOC] of my concerns. And he said -- the fellow on the other end of the line said something to the effect of, are -- are you concerned about discrimination in view -- and by this time, I believe Chris or somebody had mentioned that, you know, that this was an Arab name or Arabic name or something like that. And I said -- and Chris [Konevich] advised me that there were a number of other Arabic-sounding names that were getting on this airplane. And this was the -- and the conversation down the jet bridge was about the first time that I became aware of an opinion that -- that it was an Arab-sounding name. And so when I was on the phone with the guy, I said, Look. I'm going to let everybody else on this airplane whether they're Arabs or not or whatever. But this particular individual is not getting on the airplane because of the concerns raised by a United States Marshal. And I have no choice. I have a moral obligation to make this flight safe. [bracketed material supplied for clarification]

Blackstone Deposition at 18-19.

This testimony establishes several significant points. First of all, Captain Blackstone's testimony is substantially consistent with that of Ms. Konevich, which is emphasized by Mr. Alshrafi. At some point, most likely during their walk down the jet bridge, he learned that Mr. Alshrafi's name sounded Arabic. The fact that his recollection is slightly at variance with Ms. Konevich's (to the effect that she told him the passenger's name) is irrelevant, because there is <u>no</u> evidence to dispute that he acquired this knowledge <u>after</u> making his decision. Furthermore, Deputy Marshal Renzi's affidavit <u>does</u> <u>not</u> say that Mr. Alshrafi's name was ever mentioned during his conversation with Captain Blackstone. In fact, Renzi confirms the contrary in his affidavit:

> 7. After speaking with the Captain, I took a few steps away from the podium and stood beside the gate counter. At this time a female American Airline employee, whom I later learned is Christine Konevich approached Brian Ferreira and they began talking at the gate counter. Next, the passenger in question was called to the gate counter. The passenger, <u>**whom I later learned is Jehad Alshrafi**</u>, was professionally attired and well groomed. Ha (*sic*) had dark hair and olive skin. Passenger Alshrafi started talking with Brian Ferreira and Christine Konevich and was told that he would not be flying. He began asking why and offered identification. Passenger Alshrafi showed then his passport and other identification. [Emphasis supplied].

3

Thus, the one fact in this entire scenario that is <u>not</u> disputed is that neither Marshal Renzi nor Captain Blackstone knew Mr. Alshrafi's name when they first conversed at the podium. The other fact that is not in dispute is that this conversation was the catalyst for Captain Blackstone's decision.

Therefore, there is no genuine issue of any material fact on the sole relevant issue, which is Captain Blackstone's state of mind when he made his decision to deny boarding to a passenger who subsequently turned out to be Mr. Alshrafi. Therefore, Mr. Alshrafi's Opposition does not raise any genuine issue of <u>material</u> fact, and the task for this Court is application of the governing legal principles. As will be shown below, the arbitrary and capricious standard of Section 44902(b) is the only proper basis for evaluating Captain Blackstone's actions.

**B.    The Sole Basis for Evaluating Captain Blackstone's Actions is the "Arbitrary and Capricious" Standard of § 44902(b), and the Record is Devoid of Any Such Evidence.**

The Defendants' initial Memorandum addressed the broad discretion afforded to commercial airlines and their pilots by virtue of Section 44902(b). *Willams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir.1975). The cases construing the scope of the enactment and the authority granted to commercial airline pilots consistently hold that the arbitrary and capricious standard is the sole basis for evaluating a pilot's decision to refuse transport, and that such decisions must be viewed in light of the information available to the pilot at the time the decision is made, and are not "to be tested in hindsight." *Id.* All of the cases consistently hold that the pilot's state of mind is the key, and that the test is "whether or not the opinion and decision were rational or reasonable and not *capricious or arbitrary* in the light of those facts and circumstances." *Id.* [emphasis added]. In fact, the *Williams* court held that such a decision cannot be unlawful absent a showing that "on the face

4

of the information which [the airline] received . . . that [it] was so absurd, bizarre, inaccurate, contradictory or so dubiously authentic as to put [the airline] on further inquiry as to the truth of the reports which it acted upon." *Id.* at 948.

Captain Blackstone's decision here was made in circumstances acknowledged in *Adamsons v. American Airlines, Inc.*, 444 NE.2d 21, 24 (N.Y. 1982), which are "[t]hat an airline usually must make such decisions on the spur of the moment, shortly before takeoff, without the benefit of complete and accurate information." *Id.* That court correctly noted that "[t]he law endows the airline with discretion in accepting or rejecting a passenger, based upon considerations of safety and problems inherent to air travel, and that such discretion, if exercised in good faith and for a rational reason, must be accepted." *Id.* [emphasis supplied]. Furthermore, courts deciding these cases have explicitly recognized that "[i]n the present case, it should not be forgotten that the decisions at issue were made in an atmosphere pervaded by the fears and uncertainties arising from the events of September 11, 2001." *Dasrath v. Continental Airlines, Inc.*, 228 F.Supp.2d 521, 529 (D.N.J. 2002).

In ruling upon the *bona fides* of Captain Blackstone's decision, this Court must give great weight to his testimony that he was in Manhattan on 09/11, and actually saw one of the airplanes that struck the World Trade Center pass overhead, making note of how low the plane was flying. Furthermore, he had previously piloted that very aircraft, and this testimony is probative of his state of mind, acknowledged by the *Dasrath* court as being relevant:

> I was in Manhattan, walking down the street, when an airliner passed over my head. And I said, as a pilot, because every time a plane flies over whether it's a Cessna or a 747, I thought, gee, that guy is kind of low; and I'll bet he's going to have a bad day with the chief pilot. And I didn't think anything else about it. And then I -- my pager goes off. And my family from California says, Are you okay? Why? Well, American Airlines just flew into the North Tower. Well, that plane

5

> that flew into the North Tower has a logbook in it. Okay. And that logbook is signed, . . . Captain Mike Blackstone. That logbook is part of my flying history. It went into that building. I flew that plane in the last week before September 11th. The plane that went into the Pentagon, I had flown in the last few months; I'm positive. Okay. So am I a little sensitive to what happened on September 11th? You bet I am. I mean, I had people calling me around the country, Are you alive? Why? Well, I flew the jet in the night before. And, the next day, maybe even the same airplane flies into a building. Yeah. I'm sensitive about it. And it's not going to happen again on my watch.

Blackstone Deposition at 60-61.

The foregoing case law and testimony establishes that the sole basis for evaluating Captain Blackstone's decision must be the uniform standard contemplated by Section 44902(b), which is "arbitrary and capricious," or "irrational." Not only does Captain Blackstone's testimony defeat any notion that his decision fell into those categories, but it shows the importance of applying only the arbitrary and capricious standard, and not any other test such as a violation of a state law criminal statute such as G.L. ch. 272 § 98 that prohibits a denial of public accommodation based upon unlawful discrimination (among other things). To subject Captain Blackstone's decision to any other standard would frustrate the purpose of section 44902(b), and in determining whether Mr. Alshrafi has raised a genuine issue of material fact, this Court must perforce limit its inquiry to whether or not his decision was arbitrary and capricious. The undisputed facts show that it was not.

II. **MR. ALSHRAFI'S DISCRIMINATION CLAIM AND HIS COMMON LAW CLAIM FOR THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE BOTH PREEMPTED BY THE AIRLINE DEREGULATION ACT.**

Mr. Alshrafi responds to the Defendants' preemption argument with the facile statement that discrimination suits against carriers are not preempted. This is fundamentally too simplistic; the mere fact that Mr. Alshrafi's claims spring from alleged discrimination misses the point that the purportedly discriminatory action at issue in this suit arose in the context of safety and security decisions, over which there is extensive federal regulation and oversight. While some sorts of discrimination or tort claims may not be preempted, when such claims spring from security related decisions, the claims are preempted.

**A. Mr. Alshrafi's Reliance on *Doricent v. American Airlines* is Misplaced.**

Mr. Alshrafi puts great reliance upon this Court's prior decision in *Doricent v. American Airlines, Inc.*, No. 91-12084Y, 1993 WL 437670, at *1 (D. Mass. Oct. 19, 1993), but that case has no bearing to the preemption analysis here. *Doricent* involved claims of blatant racial epithets and inexcusable humiliation being inflicted upon a passenger. The issues of safety and security, and boarding practices which are the province of 49 U.S.C. §44902(b), were not raised by the defendant airline, nor even arguably involved. Any preemption argument or analysis in that case was completely devoid of the issues presented by the instant case. In contrast, the Defendants here have demonstrated sufficient evidence that the issue is not a sham, and thus the only proper analysis is to proceed with an examination of 49 U.S.C. §41713(b) in conjunction with §44902(b).

7

**B.     The Enforcement of State Anti-Discrimination Statutes Would Significantly Affect Pre-Departure Screening Practices and Related Security Decisions, Both of Which Are "Services" Encompassed by the Airline Deregulation Act.**

In determining whether state law will be preempted by the Airline Deregulation Act, a court must ascertain whether the specific law sought to be enforced is related to the pricing, routes, and services of an airline's business, or has a "forbidden significant effect" on those aspects. *Fadaie v. Alaska Airlines, Inc.*, 293 F.Supp.2d 1210, 1215 (W.D.Wash. 2003). Pre-departure screening of passengers has been held to be a service contemplated by the Act. *Huntleigh Corp. v. Louisiana State Board of Private Security Examiners*, 906 F. Supp 357, 361 (M.D. La. 1995).[2] Accordingly, Captain Blackstone's act of pre-screening Mr. Alshrafi as a potential security risk falls under the rubric of "services" and is covered by the provisions of the Act.

The enforcement of various state anti-discrimination laws in the factual context of a case such as this one, with differing provisions and bases for determining liability, would therefore "result in significant *de facto* regulation of the airlines' boarding practices and, moreover, would interfere with federal law granting the airlines substantial discretion to refuse to carry passengers." *Hodges v. Delta Airlines, supra,* 44 F.3d at 339. In order to maintain a consistent federal scheme for pre-screening of passengers, the plaintiff's state law claims must be preempted.

---

[2] *See also Hodges v. Delta Airlines*, 44 F.3d 334, 336 (5th Cir.1995): "Services" generally represent a bargained-for or anticipated provision of labor from one party to another.... Elements of the air carrier service bargain include items such as ticketing, <u>boarding procedures</u>, provision of food and drink, and baggage handling, in addition to the transportation itself." [Emphasis supplied].

8

### C.   Mr. Alshrafi's State Law Claims Are Preempted Because Congress Intended to Have One Uniform Standard Applied to Airline Security Decisions.

"Beginning with the presumption that Congress does not intend to displace state law, especially in traditional areas of state control... courts go on to weigh whether the central motivations behind the federal law favor preemption - in other words, whether allowing state law to govern would undermine federal control or weaken the protections Congress intended to provide." *In re World Trade Center Disaster Site Litigation*, 270 F.Supp.2d 357, 367 (S.D.N.Y. 2003) [citations omitted]. Further, "preemption must be considered in light of Congress's purposes in enacting the statute." *Gerosa v. Savasta & Co.*, 329 F.3d 317, 325 (2d Cir.2003). The federal government clearly indicated its intent that 49 U.S.C. § 4713(b) be extended to matters concerning airplane safety and security. The Federal Aviation Act provides, at 49 U.S.C. § 40101 (a), as follows:

(a)   **Economic regulation.** In carrying out subpart II[3] of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity... in established safety procedures, recognizing the clear intent, encouragement, and dedication of Congress to further the highest degree of safety in air transportation and air commerce, and ***to maintain the safety vigilance*** that has evolved in air transportation and air commerce and has come to be expected by the traveling and shipping public.

49 U.S.C. §40101 (a) at (1) and (3) [emphasis added].

In addition to expressly providing that safety and security are prime considerations when evaluating whether a state law is preempted under § 41713(b), following the tragedy of September 11, 2001, Congress has implicitly indicated an intent to occupy the field of airport security screening to the exclusion of state law. Implicit preemption may be shown when "the pervasiveness of the

---

[3] The preemption clause, § 41713(b), falls within subpart II of the Act.

federal regulation precludes supplementation by the states, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it... reveal the same purpose," or if the state law conflicts with the federal law. *French v. Pan Am Express*, 869 F.2d 1, 2 (1st Cir.1989) [citations omitted].

In *French*, the First Circuit found that the Federal Aviation Act preempted state law for drug testing of pilots, because the Act charged the Secretary of Transportation with promulgating an extensive and comprehensive legal scheme to qualify pilots in order to assure air safety. Similarly, in *Huntleigh Corporation v. Louisiana State Board of Private Security Examiners*, *supra*, the court concluded that state laws pertaining to the registration and training of private security officers performing pre-departure airport screenings were preempted by the Airline Deregulation Act (and the superseding Federal Aviation Act), because the Act required the Administrator of the FAA to regulate training standards and minimum qualifications for employees who conduct security screening. *Id.*, 906 F.Supp. at 361. The *Huntleigh* court explained that to allow the states to prescribe the standards and qualifications of these employees would frustrate the federal intention to make these standards uniform, and therefore the state law was in conflict with the federal law. *Id.*

Congress has shown a similar intent to occupy the field of airline security by enacting 49 U.S.C. § 44902, which provides for the Under Secretary of Transportation for Security to enact regulations by which an "air carrier... may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." The office of Under Secretary was created with the passage of the Aviation Transportation and Security Act (49 U.S.C. §114), enacted on November 19, 2001 in response to the events of September 11.

In addition to fashioning regulations to enforce §44902, the Under Secretary is charged with responsibility for security in all modes of transportation, including screening procedures under sections 44901 and 44935; developing standards for the hiring, retention and training of security screening personnel; enforcing security-related regulations and requirements; overseeing the implementation and ensuring the adequacy of airport security measures at airports and other transportation facilities; working in conjunction with the FAA Administrator with respect to any actions or activities that may affect aviation safety or air carrier operations, and to carry out such other duties and exercise such other powers relating to transportation security to the extent authorized by law. 49 U.S.C. § 114, subsections (d)-(f). The Under Secretary's wide-ranging powers and duties plainly evidence Congress' intent to occupy the field of air security and to establish uniform standards.

Finally, as this Circuit said in *French*, preemption may also be inferred from the goals of a statute,[4] and one of the goals of the Federal Aviation Act is clearly to uphold national standards for air security. Although the nation's courts have declined in certain instances to hold that the Act preempts various state law claims (*i.e.* breach of contract, negligence, etc.) as detailed by Mr. Alshrafi in his Opposition (pp. 14-15), preemption has never been denied when airline security is specifically at stake. All state laws must be interpreted consistently with 49 U.S.C. § 44902, congruent with the federal government's "paramount interest" in regulating aviation. *Schaeffer v. Cavallero*, 29 F.Supp.2d 184,185 (S.D.N.Y. 1998). "The construction of § 44902 is *necessarily* a substantial issue in *any* case regarding a passenger's removal from an airplane." *Id.* [emphasis added].

11

When a state law either conflicts with federal law or interferes with the fulfillment of congressional objectives, preemption occurs even though state law may not be entirely displaced. *O'Carroll v. American Airlines, Inc.*, 863 F.2d 11 (5th Cir.1989). If every state could impose different limits on an airline's right to refuse transportation, then airlines would inevitably be subject to different standards of conduct in different states, frustrating Congress' intention to create a uniform and exclusive system of federal regulation. *Schaeffer, supra* at 186 [citations omitted]. Accordingly, Mr. Alshrafi's state law claims are preempted by the Federal Aviation Act.

The above analysis demonstrates that this Court should rule consistent with *Huggar v. Northwest Airlines, Inc.*, No. 98 C 594, 1999 WL 59841, at *5-6 (N.D. Ill. Jan. 27, 1999), which held that the plaintiff's state law discrimination claim was preempted. Like the plaintiff in *Huggar*, Mr. Alshrafi's case arises directly out of a decision prompted by a pilot's <u>mandate</u> to refuse boarding to any passenger who is or may be inimical to the safety and security of the flight's passengers or crew. Mr. Alshrafi's attempts to vitiate *Huggar* by reliance on *Doricent* are misplaced by virtue of the facts of this case and the issues presented for decision here. *Doricent* has no effect on the instant case and should not govern because that case bore no relationship to safety or security. Conversely, *Huggar* is the better rule of law here because it is more consonant with the facts and contentions of the respective parties to the instant case. This Court's ruling should be consistent with *Huggar* and it should find that Mr. Alshrafi's common law claims are preempted.

Plaintiff, for reasons known only to him and his lawyers, chose to bring only two state law claims in this case. Both are preempted; thus, plaintiff's case fails in its entirety.

---

[4] 869 F.2d at 5, *supra*.

## CONCLUSION

For the foregoing reasons, this Court should grant the Defendants' Motion for Summary Judgment in the instant case.

> AMERICAN AIRLINES, INC. and
> MICHAEL E. BLACKSTONE,
> By their Attorney,
>
> *[signature]*
>
> Michael A. Fitzhugh, BBO #169700
> **FITZHUGH, PARKER & ALVARO, LLP**
> 155 Federal Street, Suite 1700
> Boston, MA 02110-1727
> (617) 695-2330

February 17, 2004

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by first class mail postage prepaid, on February 17, 2004.

*[signature]*
Angelina Velazquez