UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EK VENTURES I, LLC; DAVID L. TAYLOR; DAVID L. TAYLOR AND VIRGINIA L. ATYLOR as TRUSTEES FOR THE TAYLOR FAMILY REVOCABLE TRUST; and FLEXTRONICS INTERNATIONAL LTD., <br><br> *Plaintiffs,* <br><br> v. <br><br> JAMES R. BARTLETT and Z.B.R. PUBLICATIONS, INC., <br><br> *Defendants,* <br><br> and <br><br> JAMES R. BARTLETT, <br><br> *Third Party Plaintiff,* <br><br> v. <br><br> GLOBALWARE SOLUTIONS, INC., ANTHONY RUDSTON and BRADELY A. JAY, <br><br> *Third Party Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    C.A. No. 03-CV-12506-MNG |

**DEFENDANT JAMES R. BARTLETT'S OPPOSITION TO PLAINTIFFS'
"MOTION TO COMPEL DISCOVERY RESPONSES FROM
DEFENDANT JAMES R. BARTLETT"**

**INTRODUCTION**

Defendant, James R. Bartlett ("Bartlett"), hereby opposes the plaintiffs' inaccurately

named Motion To Compel Discovery Responses From James R. Bartlett.  Long before the

motion was served, Bartlett had produced documents and provided a written response, pursuant to Mass. R. Civ. 34, to plaintiffs' document requests to Bartlett.[1]  Accordingly, there is no discovery response to be compelled.  There is, however, a limited controversy between the parties over three of plaintiffs' thirty-four document requests to Bartlett.  As will be shown, there is no basis for compelling Bartlett to produce document responsive to those three requests (Document Request Nos. 26, 27 and 30).

## NATURE OF THE CASE

Plaintiffs are the parties to a "STOCK PURCHASE AND SALE AGREEMENT for the Acquisition of BINDCO by GLOBALWARE SOLUTIONS, INC." dated February 4, 2000.  They allege that all of them are "signators to the February 4, 2000 Agreement ('Agreement')."

Defendant ZBR Publications, Inc. ("ZBR") and the third-party defendant GlobalWare Solutions, Inc. ("GWS"), which is not named in this action as a defendant, are parties to the Agreement.  Bartlett is not.  While he signed the Agreement in his capacity as a corporate officer of ZBR and of GWS, he did not sign in his individual capacity.  Pursuant to the Agreement, GWS acquired the plaintiffs' shares of Bindco Corporation.

Plaintiffs allege that certain representations set out in Article VI of the Agreement were "false representations."  Plaintiffs also allege that Bartlett engaged in a "pattern of misappropriation of corporate funds [of GWS] for his personal benefit and that of his family and friends ...."  They assert claims for breach of contract (Count I), breach of warranty (Count II), breach of implied covenant of good faith and fair dealing (Count III), negligent

---

[1]    Because plaintiffs' motion and supporting memorandum violate Local Rule 37.1(B) in that they fail to set forth Bartlett's responses to the document requests at issue, the Court is given the incorrect impression that Bartlett never responded.  Bartlett's responses are set forth below along with the relevant document requests.

misrepresentation (Count IV), breach of fiduciary duty (Count V) and unjust enrichment (Count VI).

In a related previously filed case which is pending in the Superior Court for Essex County, Massachusetts, *James R. Bartlett v. GlobalWare Solutions Inc.*, Essex Sup. Ct. C.A. No. 03-1411C, GWS is pursuing a Counterclaim against Bartlett that alleges the same misappropriations as those alleged here by the plaintiffs. A copy of that Counterclaim (without exhibits) dated August 18, 2003 is attached hereto as Exhibit A. In its Counterclaim, GWS alleges, *inter alia*, that "Bartlett had improperly used corporate resources for his own personal benefit and that of his family and friends." Ex. A, p. 10, ¶ 18. Thus, plaintiffs' allegation here is a near verbatim restatement of the allegation previously made by GWS in the Essex County Superior Court Action.

**PLAINTIFFS' REQUEST NO. 26.**

Please produce all documents relating to transactions between ZBR and/or GlobalWare and relatives and/or personal associates of Bartlett.

**BARTLETT'S RESPONSE NO. 26.**

Objection. Bartlett objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

## ARGUMENT WITH RESPECT TO REQUEST NO. 26

Plainly, Request No. 26 concerns plaintiffs' claim that Bartlett misappropriated corporate funds of GWS, a claim that GWS is already pursuing in the Essex County Superior Court Action. From the outset of this case, it has been Bartlett's contention that that claim against Bartlett is a derivative claim that must be brought pursuant to the specific requirements of Fed. R. Civ. P. 23.1 and Delaware law, GWS's state of incorporation. It is undisputed that plaintiffs have not complied with those requirements.

3

At the time that plaintiffs filed their Complaint, Delaware law instructed that the distinction between derivative and individual actions turned on the existence of a "special" injury to the party alleging the wrongdoing. *Kramer v. Western Pacific Indus. Inc.,* 546 A.2d 348, 351 (Del. 1988); *Lipton v. News Int'l. Plc.,* 514 A.2d 1075, 1079 (Del. 1986).

On January 21, 2004, Bartlett filed a motion to dismiss the plaintiffs' complaint in which he argued, *inter alia*, that Count V of the Complaint should be dismissed under the *Kramer* line of cases. On March 2, 2004, the Court (Young, D.J.) denied the defendants' motions to dismiss.

A month later, on April 2, 2004, in the case of *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031 (Del. 2004), the Supreme Court of Delaware abolished the longstanding "special injury" test that Delaware courts had used to distinguish between direct and derivative claims. Declaring that the "special injury" concept previously used by Delaware courts to distinguish between direct and derivative actions was "amorphous," "confusing," and "not helpful to a proper analytical distinction," the Delaware Supreme Court overruled the "special injury" test and instituted a new test to determine the nature of a stockholder's claim. *Tooley v, Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d at 1034-35. The court explained that both the "special injury" concept and the proposition that an action cannot be direct if all stockholders are equally affected were confusing propositions that "have encumbered our case law governing the direct/derivative distinction." *Id.* at 1038-39. Because the decision whether a suit is direct or derivative may be outcome determinative, the court reasoned that "it is necessary that a standard to distinguish such actions be clear, simple and consistently articulated and applied by our courts." *Id.* at 1036.

Under current Delaware law, as set forth in *Tooley*, the issue of whether a shareholder's claim is derivative or direct must turn "*solely* on the following questions: (1) who suffered the

alleged harm (the corporation or the suing stockholders, individually); and (2) who would

receive the benefit of any recovery or other remedy (the corporation or the stockholders,

individually)?" *Id.* at 1033 (emphasis in original). A stockholder pursuing a purportedly direct

claim must be able to demonstrate "that he or she can prevail without showing an injury to the

corporation." *Id*;[2] *accord In re Synchor Int'l Corp. Shareholders Litigation*, 857 A.2d. 994, 996

(Del. Ch. 2004); *Dieterich v. Harper*, 857 A.2d 1017, 1026 (Del. Ch. 2004).

Given that plaintiffs' allegations are that Bartlett had "improperly used GlobalWare

corporate resources for his own personal benefit and that of his family and friends," *Complaint*, ¶

30, and of "misappropriation of corporate funds", *id.*, ¶ 31, plaintiffs cannot prevail without

showing an injury to GWS. Accordingly, its misappropriation claims are not direct claims of the

plaintiffs, but derivative claims, which must be asserted derivatively.

It necessarily follows then that those claims against Bartlett for breach of fiduciary duty

are subject to dismissal and futile because they fail to comply with the requirements of Rule 23.1

of the Federal Rules of Civil Procedure. First and foremost, the Complaint fails to:

> allege with particularity the efforts, if any, made by plaintiff to obtain the action
> the plaintiff desire from the directors or comparable authority and, if necessary,
> from the shareholders or members, and the reasons for the plaintiff's failure to
> obtain the action or for not making the effort.

Fed. R. Civ. P. 23.1. Moreover, the Complaint is not "verified" as required by the rule. *Id.*

Such failures warrant dismissal of Count V of the Complaint. *Gonzalez Turul v. Rogatol*

*Distributors, Inc.,* 951 F.2d 1, 2 (1st Cir. 1991) ("this circuit vigorously enforces [Fed. R. Civ. P.

23.1] requirements and will dismiss derivative action where plaintiffs do not comply"); *Heit v.*

---

[2]    After announcing the new test, the court in *Tooley* did not apply it to the case before it, as
the court upheld the chancellor's ruling that the plaintiff had failed to state a claim for either
direct or derivative relief. *Id.* at 1039-40.

*Baird*, 567 F.2d 1157, 1160 (1st Cir. 1977) (failure to comply with Fed. R. Civ. P. 23.1 "requires dismissal of the suit").

Because the plaintiffs underlying misappropriation and breach of fiduciary duty claims are not viable, Request No. 26 is not reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, even if those claims were not dismissible, the request is overbroad and unduly burdensome. Bartlett's "personal associates" would include the many dozen of individuals with whom he worked at ZBR and GWS during three decades. The plaintiffs should not be permitted to employ scattershot, undisciplined discovery to pursue allegations which are, as a matter of law, futile and going nowhere.

**PLAINTIFFS' REQUEST NO. 27.**

Please produce all correspondence, emails, meeting notes and other records of communications with Maria Muise, and any other documents relating to Maria Muise.

**BARTLETT'S RESPONSE NO. 27.**

Objection. Bartlett objects to this request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

### ARGUMENT WITH RESPECT TO REQUEST NO. 27

Maria Muise worked as an executive, and later an officer and director, of GWS and its predecessor ZBR Publications from January 1996 to February 2003. Accordingly, during that seven-year time frame, Bartlett had innumerable meetings and e-mails with her on all manner of subjects concerning those companies' business operations.

Request No. 27 is not limited in scope either as to subject matter or as to time frame. As such, it casts an indiscriminate and sweeping net that would encompass all manner of documents without regard to whether they have any relationship to the subject matter of this action. Thus,

6

as Bartlett's objection states, it is overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence.

To the extent Request No. 27 seeks to discover material relating to Bartlett's alleged

"misappropriation of corporate funds for his personal benefit and that of his family and friends,"

Bartlett incorporates by reference his Argument With Respect To Request No. 26.

**PLAINTIFFS' REQUEST NO. 30.**

Please produce all correspondence, emails meeting notes and other records of

communications between Bartlett and representatives of Mezzanine.

**BARLETT'S RESPONSE NO. 30.**

Bartlett will produce all non-privileged documents responsive to this request within his

possession, custody or control.

### ARGUMENT WITH RESPECT TO REQUEST NO. 30

Page 4 of plaintiffs' Memorandum states that during the discovery teleconference

between counsel on November 22, 2004, Bartlett's undersigned counsel stated that "he did not

believe that he was required to produce documents relating to his communications with

Mezzanine on Bartlett's behalf."

Plaintiffs' counsel may have misunderstood what was said. What Bartlett's counsel said

was that Bartlett's production did not include communications with representatives of Mezzanine

Management concerning possible *settlement* of the various lawsuits between the parties,

including this one, and the claims asserted in them. Mezzanine Management is currently the

controlling majority shareholder of GWS. Since 2003, the plaintiffs, Mezzanine Management

and Bartlett have been engaged in triangular settlement discussions with the hope of resolving

the parties' various claims and grievances. Certainly, the parties should be encouraged to have

open and frank settlement discussions without fear that such communications would have to be

produced in discovery. While documents relating to settlement negotiations are not immune from discovery, the burden is "on the party seeking discovery to make a particularized showing" that such documents "are relevant and likely to lead to the discovery of admissible evidence." *Philadelphia's Church Of Our Savior v. Concord Township*, 2004 WL 1824356 * 4 (E.D. Pa. July 27, 2004), *quoting Key Pharmaceuticals v. ESI-Lederle, Inc.*, 1997 WL 560131 * 2 (E.D. Pa. Aug. 29, 1997), *quoting Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993); *see also Thorton v. Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992).

Here, the plaintiffs have not articulated any basis as to why such communications are likely to lead to the discovery of admissible material nor any other reasons to compel their production. Thus, they have failed to meet their burden and their motion should be denied.

## CONCLUSION

Bartlett respectfully requests that the Court deny the plaintiffs' motion to compel.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(D), Bartlett requests a hearing on plaintiffs' motion to compel.

Defendant

**JAMES R. BARTLETT**

By his attorneys,

Thomas S. Fitzpatrick/BBO #556453
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place
Boston, Massachusetts 02108
(617) 367-2500

Dated: December 7, 2004

**CERTIFICATE OF SERVICE**

I, Thomas S. Fitzpatrick, hereby certify that on December 7, 2004, the above opposition was sent electronically to:

David F. Anderson     danderson@lattianderson.com

Douglas R. Roach     droach@groffmurphy.com

David M. Ryan     dryan@nixonpeabody.com

Melissa B. Tearney     mtearney@nixonpeabody.com

Thomas S. Fitzpatrick

341116v.1

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                      SUPERIOR COURT
                                               CIVIL ACTION NO. 03-1411C

| | |
|---|---|
| **JAMES R. BARTLETT** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GLOBALWARE SOLUTIONS, INC.,** | ) |
| | ) |
| **Defendant** | ) |

## GLOBALWARE SOLUTIONS, INC.'S
## ANSWER, COUNTERCLAIM AND JURY DEMAND

Pursuant to Mass. R. Civ. P. 8, the Defendant, GlobalWare Solutions, Inc.

("GlobalWare"), hereby answers the Complaint of the Plaintiff, James R. Bartlett, ("Bartlett") as

follows:

1.      GlobalWare is without knowledge or information sufficient to form a belief as to

the truth of the allegations of Paragraph 1, and therefore can neither admit nor deny same.

2.      GlobalWare admits the allegations contained in Paragraph 2.

3.      GlobalWare admits the allegations contained in Paragraph 3.

4.      GlobalWare admits that it entered into the Transitional Employment Agreement

(the "Employment Agreement").  GlobalWare further states that Bartlett did not execute the

Employment Agreement until March 2003.  No response is required of GlobalWare to the

remaining allegations contained in Paragraph 4 because the Employment Agreement speaks for

itself.

5.      GlobalWare denies the allegations contained in Paragraph 5.

6.      No response is required of GlobalWare to the allegations contained in Paragraph 6

because the Employment Agreement speaks for itself.

7.      No response is required of GlobalWare to the allegations contained in Paragraph 7 because the Employment Agreement speaks for itself.

8.      No response is required of GlobalWare to the allegations contained in Paragraph 8 because the Employment Agreement speaks for itself.

9.      No response is required of GlobalWare to the allegations contained in Paragraph 9 because the Employment Agreement speaks for itself.

10.     No response is required of GlobalWare to the allegations contained in Paragraph 10 because the Employment Agreement speaks for itself.

11.     No response is required of GlobalWare to the allegations contained in Paragraph 11 because the Employment Agreement speaks for itself.

12.     No response is required of GlobalWare to the allegations contained in Paragraph 12 because the Employment Agreement speaks for itself.

13.     No response is required of GlobalWare to the allegations contained in Paragraph 13 because the Employment Agreement speaks for itself.

14.     GlobalWare admits the allegations contained in Paragraph 14.

15.     GlobalWare is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and therefore can neither admit nor deny same.

16.     GlobalWare admits that on or about February 17, 2003, GlobalWare named Tony Rudston as interim Chief Executive Officer of GlobalWare and Ian Cameron as President of GlobalWare.

17.     GlobalWare admits the allegations contained in Paragraph 17.

18.     GlobalWare denies the allegations contained in Paragraph 18.

19.    GlobalWare denies the allegations contained in Paragraph 19.

20.    GlobalWare denies the allegations contained in Paragraph 20.

21.    GlobalWare denies the allegations contained in Paragraph 21.

22.    GlobalWare is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 22. GlobalWare denies the remaining allegations contained in Paragraph 22.

23.    GlobalWare admits that it informed Bartlett that the Visa and MasterCard charges were not reimbursable by GlobalWare. GlobalWare denies the remaining allegations contained in Paragraph 23.

24.    GlobalWare admits that it has not paid Bartlett's First USA charges. GlobalWare denies the remaining allegations contained in Paragraph 24.

25.    GlobalWare admits that it has not paid Bartlett's Chase MasterCard charges. GlobalWare denies the remaining allegations contained in Paragraph 25.

26.    GlobalWare denies the allegations contained in Paragraph 26.

27.    GlobalWare admits the allegations contained in Paragraph 27 and further states that Bartlett, not GlobalWare, was responsible for delays in payment, if any.

28.    GlobalWare admits the allegations contained in Paragraph 28 but further states that Bartlett, not GlobalWare, was responsible for delays in payment, if any.

29.    GlobalWare admits the allegations contained in Paragraph 29 but further states that Bartlett, not GlobalWare, was responsible for delays in payment, if any.

30.    GlobalWare admits the allegations contained in Paragraph 30 but further states that Bartlett, not GlobalWare, was responsible for delays in payment, if any.

31.    GlobalWare denies the allegations contained in Paragraph 31.

32.    GlobalWare denies the allegations contained in Paragraph 32.

33.    GlobalWare is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33, and therefore cannot admit or deny same.

34.    GlobalWare denies the allegations contained in Paragraph 34.

35.    GlobalWare admits that it paid Bartlett's automobile allowance for March 1, 2003 and April 1, 2003 by May of 2003 but further states that Bartlett, not GlobalWare, was responsible for delays in payment, if any.

36.    GlobalWare admits that it received a letter from Bartlett's counsel, Thomas S. Fitzpatrick, dated April 10, 2003. No further response is required of GlobalWare to the remaining allegations contained in Paragraph 36 because the letter speaks for itself.

37.    No response is required of GlobalWare to the allegations contained in Paragraph 37 because the letter speaks for itself.

38.    GlobalWare is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38, and therefore can neither admit nor deny same.

39.    GlobalWare admits that it received a letter dated April 24, 2003 from Attorney Fitzpatrick. No further response is required of GlobalWare to the remaining allegations contained in Paragraph 39 because the April 24, 2003 letter speaks for itself.

40.    GlobalWare admits the allegations contained in the first sentence of Paragraph 40. GlobalWare further admits that Ms. Tearney received a fax from Attorney Fitzpatrick containing a copy of the April 24, 2003 letter and attachments. GlobalWare denies the remaining allegations contained in Paragraph 40.

41.    GlobalWare admits that its counsel received a letter dated May 21, 2003 from

Attorney Fitzpatrick. No response is required of GlobalWare to the remaining allegations contained in Paragraph 41 because the May 21, 2003 letter speaks for itself.

42.     GlobalWare admits that its attorney received a copy of a letter dated May 22, 2003 from Attorney Fitzpatrick to Attorney Everard. No further response is required of GlobalWare to the remaining allegations contained in Paragraph 42 because the May 22, 2003 letter speaks for itself.

43.     GlobalWare admits the allegations contained in Paragraph 43. GlobalWare further states that the May 23, 2003 letter speaks for itself.

44.     GlobalWare admits that it received a letter from Attorney Fitzpatrick dated June 3, 2003. No further response is required of GlobalWare to the remaining allegations of Paragraph 44 because the June 3, 2003 letter speaks for itself.

45.     GlobalWare admits the allegations contained in Paragraph 45. GlobalWare further states that the June 10, 2003 letter speaks for itself.

46.     GlobalWare denies the allegations contained in Paragraph 46.

## COUNT I
### (Breach of Contract – Against GlobalWare Solutions, Inc.)

47.     GlobalWare repeats and realleges its responses contained in Paragraph 1 through 46 of the Complaint

48.     GlobalWare denies the allegations contained in Paragraph 48.

49.     GlobalWare denies the allegations contained in Paragraph 49.

## COUNT II
### (Action for Declaratory Relief – M.G.L. c. 231A)

50.     GlobalWare repeats and realleges its responses contained in Paragraph 1 through 49 of the Complaint.

51.     GlobalWare denies the allegations contained in Paragraph 51.

52.     No response is required of GlobalWare to the allegations contained in Paragraph 52 because the Employment Agreement speaks for itself.

53.     No response is required of GlobalWare to the allegations contained in Paragraph 53 because the Employment Agreement speaks for itself.

54.     GlobalWare denies the allegations contained in Paragraph 54.

55.     GlobalWare denies the allegations contained in Paragraph 55.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Bartlett's Complaint fails to state a claim against GlobalWare upon which relief may be granted.

### Second Affirmative Defense

Bartlett's claims are barred, in whole or in part, under the doctrine of waiver.

### Third Affirmative Defense

Bartlett's claims are barred, in whole or in part, under the doctrine of estoppel.

### Fourth Affirmative Defense

Bartlett's claims are barred, in whole or in part, under the doctrine of unclean hands.

### Fifth Affirmative Defense

Bartlett's claims are barred, in whole or in part, by a failure to mitigate damages he has suffered, if any.

### Sixth Affirmative Defense

Bartlett's recovery must be set off by the sums owed to GlobalWare as a result of GlobalWare's counterclaim.

### Seventh Affirmative Defense

GlobalWare states that it has rendered complete performance of its obligations to Bartlett pursuant to the Employment Agreement.

### Eighth Affirmative Defense

Bartlett's claims are barred, in whole or in part, because he has failed to render complete performance pursuant to the Employment Agreement.

### Ninth Affirmative Defense

Bartlett's prior breach of the Employment Agreement excuses any further obligation by GlobalWare to perform.

### Tenth Affirmative Defense

GlobalWare did not materially breach the Employment Agreement.

### Eleventh Affirmative Defense

Bartlett's claims are not ripe.

## COUNTERCLAIM

## NATURE OF THE CASE

1.      These counterclaims arise out of a scheme by James R. Bartlett ("Bartlett), the former President and Chief Executive Officer of GlobalWare Solutions, Inc. ("GlobalWare"), in which Bartlett breached his duty to GlobalWare by, among other things, systematically using company resources for his and his family's benefit, using GlobalWare's assets to reward loyal friends and directing, causing, facilitating and/or permitting GlobalWare to engage in accounting irregularities to GlobalWare's detriment. This counterclaim asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty and fraud. This action also seeks declaratory relief pursuant to M.G.L. c. 231A to establish that: (i) GlobalWare

has performed its obligations under the employment agreement between GlobalWare and

Bartlett; (ii) GlobalWare has no obligation to defend or indemnify Bartlett to the extent that he

has acted in bad faith or otherwise not in accordance with Delaware law; and (iii) Bartlett is

bound by the non-competition clause contained in the parties' employment agreement.

## PARTIES

2.      On information and belief, James R. Bartlett is an individual residing at 672

Chestnut Street, Lynnfield, Essex County, Massachusetts 01940.

3.      GlobalWare Solutions, Inc. is a Delaware corporation with a principal place of

business in Haverhill, Essex County, Massachusetts.

## JURISDICTION AND VENUE

4.      All facts relevant to this action occurred in the Commonwealth of Massachusetts.

5.      Bartlett has subjected himself to this Court's jurisdiction by initiating his

Complaint against GlobalWare in this Court.

6.      Venue is proper in this county pursuant to M.G.L. c. 223, § 8.

7.      The amount in controversy in this action is in excess of the jurisdictional

requirements of this Court.

## BACKGROUND FACTS

8.      GlobalWare currently provides a variety of services including software contract

manufacturing, fulfillment, digital content management, supply chain management, and e-

commerce solutions for technology based companies.

9.      In 2000, GlobalWare acquired Z.B.R. Publications, Inc. ("Z.B.R."). Z.B.R. was

founded in 1978 as a full service print and documentation firm providing services to the defense

industry and hardware manufacturers. Bartlett was one of Z.B.R.'s co-founders.

10.     Bartlett served as President and Chief Executive Officer of Z.B.R. and GlobalWare.

11.     On or around November 14, 2001, Mezzanine Management Fund III 'A,' Mezzanine Management Fund III 'B', Mezzanine Management Fund III 'C' and Mezzanine Management Limited (collectively "Mezzanine"), a private equity company, made an initial investment in GlobalWare.

12.     On or around October 28, 2002, Mezzanine made a second investment in GlobalWare.

13.     On or about February 12, 2003, Mezzanine made a third investment in GlobalWare. As a result of this third investment, Mezzanine acquired a majority interest in GlobalWare of approximately 55%.

14.     On or about February 12, 2003, Bartlett resigned as GlobalWare's President and Chief Executive Officer.

15.     On or about February 12, 2003, GlobalWare appointed the following corporate officers: (i) Anthony Rudston ("Rudston") as its Chief Executive Officer; (ii) Gary A. Lortie ("Lortie") as its interim Chief Financial Officer; and (iii) Ian Cameron ("Cameron") as its interim President.

16.     Effective May 30, 2003, Bartlett was removed as a GlobalWare director for cause because of his gross mismanagement of GlobalWare during calendar year 2002 through February 12, 2003, as set forth in the allegations contained herein.

## BARTLETT'S USE OF GLOBALWARE'S RESOURCES
## FOR HIS OWN PERSONAL BENEFIT

17.     As of February 12, 2003, the new executive team of Rudston, Lortie and Cameron assumed the day-to-day management of GlobalWare.

18.     Once in place, GlobalWare's new management team discovered that Bartlett had improperly used corporate resources for his own personal benefit and that of his family and friends.  Bartlett also failed to follow applicable accounting standards when submitting his purported business expenses to GlobalWare for payment.  Bartlett engaged in a pattern of deceptive conduct over several years which slowly drained GlobalWare of its assets.  By this misconduct, Bartlett deliberately and persistently ignored his duties of loyalty and care to GlobalWare and its stockholders.

### Use of Credit Cards

19.     On information and belief, Bartlett routinely made purchases on his credit cards and then had GlobalWare pay for these purchases as business expenses even though the purchases were not for GlobalWare's benefit and were not properly reimbursable.  A non-exhaustive list of the personal expenses Bartlett charged to GlobalWare is attached as Exhibit A.

20.     Starting at least as early as June 2001, Bartlett made personal purchases on his First USA Bank Visa ("First USA") card that had no legitimate business purpose.  For example, in August of 2001, Bartlett used his First USA card to purchase items at a business called "Love & Scandal" and, in October 2001, made a purchase at Skincare Physicians Inc.

21.     After making these personal purchases, Bartlett submitted these and other bills from his First USA card to GlobalWare for payment, misrepresenting that the charges were in fact legitimate business expenses that GlobalWare should reimburse.

22.    On information and belief, in 2001 alone, Bartlett improperly requested that GlobalWare pay at least $11,000 in personal expenses charged to his First USA card.

23.    GlobalWare, based upon Bartlett's representations that these charges were for GlobalWare related expenses, paid approximately $11,000 in personal charges made to Bartlett's First USA card in 2001.

24.    On information and belief, in 2002 Bartlett improperly requested that GlobalWare pay over $20,000 in personal expenses charged to his First USA card.  These expenses included charges made in February of 2002 to "Love & Scandal."

25.    After making these personal purchases, Bartlett submitted these and other bills from his First USA card to GlobalWare for payment, misrepresenting that the charges were in fact legitimate business expenses that should be paid for by GlobalWare.

26.    Based upon representations by Bartlett that these charges were for GlobalWare related expenses, GlobalWare paid approximately $20,000 in 2002 in personal expenses charged to Bartlett's First USA card.

27.    Starting at least as early as June 2001, Bartlett made personal purchases on his MBNA Bank MasterCard ("MBNA") credit card.  Again, many of these purchases had no relation to GlobalWare's business including charges made in June of 2001 at Club Video and a charge in November of 2001 at the Weloset Kennel.

28.    After making these personal purchases, Bartlett submitted the bills to GlobalWare for payment, misrepresenting that the charges were in fact for legitimate business expenses that should be paid for by GlobalWare.

29.    On information and belief, in 2001 alone, Bartlett improperly requested that GlobalWare pay approximately $25,000 in personal expenses charged to his MBNA card.

30.    Based upon representations made by Bartlett that these charges were for GlobalWare related expenses, GlobalWare paid approximately $25,000 of the personal charges made to Bartlett's MBNA card in 2001.

31.    On information and belief, in 2002, Bartlett improperly requested that GlobalWare pay almost $30,000 in personal expenses charged to his MBNA card. Some of these personal charges include purchases made in February of 2002 at Royal Jewelers.

32.    Again, based upon representations by Bartlett that these charges were for GlobalWare related expenses, GlobalWare paid approximately $30,000 in personal charges made to Bartlett's MBNA card.

33.    Bartlett also, by virtue of his role as GlobalWare's President and Chief Executive Officer, was authorized to use GlobalWare's corporate American Express card to pay for various corporate expenses.

34.    On information and belief, Bartlett continued his practice of using corporate resources for his own personal benefit by using the American Express card for personal charges.

35.    In 2001, Bartlett made approximately $23,000 in personal charges on GlobalWare's American Express card, including charges made in June 2001 at Wards Boat Shop and at Irwin Marine.

36.    After making these personal purchases, Bartlett submitted these and other bills from his American Express card to GlobalWare for payment, misrepresenting that the charges were in fact legitimate business expenses that should be paid for by GlobalWare.

37.    On information and belief, in 2001 alone, GlobalWare paid Bartlett at least $8,800 in personal charges based upon Bartlett's representations that these charges represented legitimate GlobalWare expenses.

38.    In 2002, Bartlett made approximately $15,000 in personal charges on GlobalWare's American Express card.

39.    On information and belief, in 2002 alone, GlobalWare paid for approximately $9,900 in personal charges based upon Bartlett's representations that these charges represented legitimate GlobalWare expenses.

40.    By having GlobalWare pay for his personal expenses, Bartlett was able to receive in 2001 approximately $44,500 in additional compensation. In 2002, he was able to receive approximately $60,000 in additional compensation.

41.    In 2003, Bartlett continued to submit personal expenses to GlobalWare for payment.

42.    Bartlett ran his personal expenses through GlobalWare and failed to follow applicable accounting standards in connection with submitting these expenses for payment. As a result, Bartlett caused, and continues to cause, GlobalWare to suffer damages.

**Use of Company Vehicles**

43.    Throughout 2001 and 2002, Bartlett or members of his family, used seven vehicles that GlobalWare owned or leased for their personal benefit and not in relation to work done for GlobalWare.

44.    All seven vehicles were garaged at Bartlett family residences in Lynnfield, Massachusetts or North Reading, Massachusetts.

45.    On information and belief, Bartlett's children were the exclusive users of an Audi A-4; a VW Cabriolet; a Ford F-350 Pick-up Truck; a 1984 GMC Dump Truck; and a 1998 Masson Utility Trailer. These vehicles were not used by GlobalWare employees for business purposes.

46.    GlobalWare paid for insurance, fuel, and maintenance and other expenses for these and other vehicles as if the vehicles were used for business purposes.

47.    Bartlett's self dealing conduct of running his personal expenses through GlobalWare caused, and continues to cause, GlobalWare to suffer damages.

**Insurance**

48.    On information and belief, Bartlett directed, caused, facilitated and/or permitted GlobalWare to pay for his personal property and casualty insurance coverage.

49.    On information and belief, Bartlett directed, caused, facilitated and/or permitted GlobalWare's insurance agent to include his personal property and casualty insurance bills in GlobalWare's periodic insurance bills.

50.    On information and belief, Bartlett directed, caused, facilitated and/or permitted GlobalWare's insurance agent to conceal that Bartlett's personal property and casualty insurance bills were being included in GlobalWare's insurance bills.

51.    Bartlett's self-dealing conduct of running his personal expenses through GlobalWare has caused, and continues to cause, GlobalWare to suffer damages.

**Other Self-Dealing Acts**

52.    Bartlett used GlobalWare's assets as a personal source of funds to reward his friends and family, even though this diversion of GlobalWare's funds caused harm to GlobalWare. By engaging in unabashed self-dealing, Bartlett breached his duties of good faith, fairness, loyalty and integrity to GlobalWare and GlobalWare's stockholders.

**i.  Hawk Printing**

53.    In 2002 and 2003, while Bartlett was GlobalWare's President and Chief Executive Officer, GlobalWare paid Hawk Printing, Inc. ("Hawk Printing") approximately $75,575 for

services it allegedly provided to GlobalWare. Hawk Printing invoiced GlobalWare for $100,325.

54.    On information and belief, Hawk Printing is owned and operated by Kevin Gearin. Mr. Gearin is the domestic partner of Ms. Donna McCoy, a longtime GlobalWare employee. While Bartlett was GlobalWare's Chief Executive Officer, Ms. McCoy was responsible for accounting activities in the accounts receivable and inventory areas. Ms. McCoy is also the daughter of one of Z.B.R.'s founders.

55.    There is no supporting documentation for GlobalWare's transactions with Hawk Printing. GlobalWare's payments to Hawk had no justified business purpose.

56.    Bartlett engaged in self-dealing when he directed, caused, facilitated and/or permitted GlobalWare to pay Hawk Printing for services Hawk Printing did not perform as a personal favor to a longtime friend and GlobalWare employee.

57.    As a result, GlobalWare suffers, and continues to suffer, damages arising out of Bartlett's self dealing conduct.

**ii.    ILS Landscaping Inc.**

58.    On or about June 25, 2001, Bartlett purportedly negotiated and executed an agreement with ILS Landscaping, Inc. ("ILS") on GlobalWare's behalf for landscaping and snowplowing services (the "ILS Contract"). At all relevant times, James A. Bartlett, Jr., Bartlett's son, owned ILS.

59.    At all relevant times, the payment terms in the ILS Contract far exceeded the market rate for landscaping and snowplowing services.

60.    On information and belief, Bartlett encouraged his son to charge GlobalWare higher rates for ILS's landscaping and snowplowing services than ILS itself originally proposed.

61.    The ILS contract allowed ILS to use at least three vehicles financed by GlobalWare and permitted ILS to keep the vehicles if the ILS contract was terminated at any time.

62.    The terms of the ILS Contract were not commercially reasonable. Bartlett engaged in self dealing by negotiating and executing the ILS Contract which he knew benefited his son to GlobalWare's detriment.

63.    GlobalWare suffers, and continues to suffer, damages as a result of Bartlett's self-dealing conduct.

### iii.    Employee Contracts

64.    During his tenure as President and Chief Executive Officer of GlobalWare and Z.B.R., Bartlett executed one-sided agreements which rewarded his loyal friends and associates while providing no benefit to GlobalWare. Bartlett appears to have caused GlobalWare to enter into these agreements for his own benefit and has cleverly concealed the true nature of these agreements to avoid detection.

65.    On or about October 9, 2001, Bartlett negotiated and executed a contract, purportedly on GlobalWare's behalf, with longtime GlobalWare employee Barbara Malinsky (the "Malinsky Contract").

66.    From December 15, 1978 to February 12, 2003, Ms. Malinsky was an executive administrative assistant. On or about December 31, 2002, Malinsky inexplicably rose to the position of a GlobalWare director.

67.    As a consequence of the Malinsky Contract, Malinsky received extremely favorable payment terms, ostensibly to take notes at GlobalWare's Board of Directors meetings but otherwise having no duties whatsoever.

68.    The Malinsky Contract had no legitimate business purpose and served no benefit to GlobalWare.

69.    On or about May 1, 1998, Bartlett negotiated and executed a contract, purportedly on GlobalWare's behalf, with longtime GlobalWare employee Richard Langlois (the "Langlois Contract").

70.    As a consequence of the Langlois Contract, on information and belief, Bartlett directly or indirectly acquired the benefit of Langlois' interest in Z.B.R. and ZBR Limited Partnership, the entity which owned GlobalWare's Haverhill facility. At the time of the Langlois Contract, Bartlett was President of ZBR, Ltd., the General Partner of ZBR Limited Partnership.

71.    As a consequence of the Langlois Contract, Langlois received extremely favorable payment terms.

72.    The Langlois Contract had no legitimate business purpose and served no benefit to GlobalWare.

73.    Bartlett engaged in self-dealing when he directed, caused, facilitated and/or permitted GlobalWare to make excessive and unnecessary payments to his "favorites," including Malinsky, Langlois, and others, with no benefit to GlobalWare.

74.    As a result of Bartlett's misconduct, GlobalWare suffered, and continues to suffer, damages.

## ACCOUNTING IRREGULARITIES

75.    As GlobalWare's President and Chief Executive Officer, Bartlett had the responsibility and duty to ensure that GlobalWare maintained financial statements which accurately reflected GlobalWare's financial condition and complied with applicable accounting

standards. Instead of fulfilling this duty, Bartlett directed, caused, facilitated and/or permitted misrepresentations about GlobalWare's financial condition to GlobalWare's detriment.

76.     Bartlett directed, caused, facilitated and/or permitted irregularities in GlobalWare's accounts receivable accounting, including without limitation: (i) revenue and accounts receivable gross-up; and (ii) unauthorized customer billing.

77.     Bartlett directed, caused, facilitated and/or permitted irregularities in GlobalWare's inventory accounting, including without limitation: (i) misclassifications of customer owned inventory; (ii) material overstatement of work-in-process inventory; (iii) inadequate reserves for excess and obsolete inventory; and (iv) unadjusted book to perpetual differences; and (iv) failure to relieve inventory at the time of customer billing.

78.     Bartlett directed, caused, facilitated and/or permitted accounting irregularities in GlobalWare's balance sheet, including without limitation: (i) unrecorded liabilities; and (ii) errant journal entries without sufficient support as required by applicable accounting standards.

79.     Bartlett directed, caused, facilitated and/or permitted GlobalWare's failure to maintain a system of internal controls to ensure the accuracy of GlobalWare's financial statements.

80.     By way of example, GlobalWare assembled kits for Avid Technologies ("Avid"). Avid owned some of the kits' components. Rather than charging Avid only for the services and equipment it supplied, GlobalWare improperly charged Avid for Avid's own inventory. As a result of improperly charging Avid for this grossed-up transaction, GlobalWare had no choice but to reverse, in February of 2003, more than $1.5 million of revenue and accounts receivable.

81.    By way of example, GlobalWare entered into a contract with Sun Soft, Inc. ("Sun Soft") to assemble kits for Sun Soft. Pursuant to the contract between GlobalWare and Sun Soft, Sun Soft agreed to pay GlobalWare for obsolete inventory that became dated before it was used in kit. However, in December 2002, GlobalWare issued three invoices to Sun Soft for approximately $690,000 for excess and obsolete inventory that did not meet the contract's criteria for such charges. These charges were booked as collectible accounts receivable when they were not. Bartlett also directed, caused, facilitated and/or permitted GlobalWare's failure to have the Sun Soft inventory properly relieved from inventory.

82.    These, and other accounting irregularities, were directed, caused, facilitated and/or permitted by Bartlett. As a result, GlobalWare's financial statements did not accurately reflect GlobalWare's financial condition. Since February 2003, GlobalWare has been forced to make downward income adjustments of approximately $18.8 million on its FYE 2002 financial statements. These write-offs include: (i) approximately $7 million in inventory; (ii) approximately $6.8 million in accrued expenses; and (iii) approximately $5 million in accounts receivable. GlobalWare anticipates that it will make additional and significant downward adjustments to its FYE 2002 financial statements.

83.    As a result of Bartlett's financial mismanagement of GlobalWare, GlobalWare has suffered, and continues to suffer, damages.

## TRANSITIONAL EMPLOYMENT AGREEMENT

84.    Effective February 12, 2003, GlobalWare and Bartlett entered into the Transitional Employment Agreement (the "Employment Agreement"). The term of the Employment Agreement commenced on February 12, 2003 through June 30, 2003. A true and accurate copy of the Employment Agreement is attached hereto as Exhibit B.

85.    Bartlett inexplicably delayed executing the Employment Agreement until in or around March 2003.

86.    Because of Bartlett's clever deception and deliberate misrepresentations, the new management team did not understand, when GlobalWare executed the Employment Agreement, the extent of Bartlett's malfeasance nor its devastating consequences on GlobalWare's financial condition.

87.    If GlobalWare's executive team had been aware of the facts alleged herein, including Bartlett's self-dealing and other misconduct, GlobalWare would not have negotiated nor executed the Employment Agreement.

88.    Pursuant to Section 4 of the Employment Agreement, Bartlett was required to render specific services to GlobalWare.  These duties included, inter alia,

> DUTIES: During the Term, Bartlett shall furnish to the Company *his best advice, information, judgment and knowledge with respect to the Company's business*. Bartlett shall provide such services to the Company as and when the Company reasonably requests from time to time during normal business hours.

(emphasis added).

89.    Bartlett breached his obligations under the Employment Agreement.

90.    Bartlett failed to provide GlobalWare with accurate information regarding GlobalWare, as required by Section 4 of the Employment Agreement, by, *inter alia*, failing to inform GlobalWare that:

a.    he charged personal expenses to GlobalWare;

b.    he improperly directed, caused, facilitated and/or permitted GlobalWare to fail to maintain financial records which accurately reflected GlobalWare's financial condition;

c.    he used GlobalWare as a source of funds with which to reward his friends and family; and

     d.  he repeatedly engaged in deliberate self-dealing to GlobalWare's detriment.

91.    Despite Bartlett's breach of his obligations under the Employment Agreement and his misrepresentations about GlobalWare's financial condition, GlobalWare complied with all of its obligations under the Employment Agreement.

92.    Pursuant to Section 1 of the Employment Agreement, GlobalWare agreed, *inter alia*, to "timely pay for all outstanding amounts due on any corporate credit cards issued to Bartlett to the extent such amounts are for properly reimbursable Company expenses."

93.    Pursuant to Section 5 of the Employment Agreement, GlobalWare agreed, *inter alia*, (i) to pay Bartlett his current salary of $250,000 per annum, plus health insurance; (ii) to pay for all expenses associated with three motor vehicles identified in Section 5(b); (iii) to arrange to have titles of the three motor vehicles identified in Section 5(b) transferred to Bartlett; and (iv) to pay a monthly automobile allowance of $897.00.

94.    GlobalWare has materially complied with all of its obligations set forth in the Employment Agreement, including its payment obligations in Section 1 and Section 5.

95.    Section 1 of the Employment Agreement also provides:

> [I]n connection with such rights of indemnification, this shall confirm: (i) that the Company shall defend at its expense, any claims brought against Bartlett by reason of his service as an officer and/or director of the Company, including but not limited to any claims brought by shareholders or creditors of the Company; (ii) that Bartlett shall remain covered under the Company's officers' and directors' liability insurance coverage; and (iii) that Bartlett's rights of indemnification shall survive the termination of this Agreement and shall continue for at least 30 days before the later to occur of (a) the expiration of any applicable statutes of limitations for all claims, or (b) until the full and final disposition of any such claims that have actually been asserted against Bartlett.

96.    Bartlett has made a demand that GlobalWare defend and indemnify him in connection with an action purportedly threatened against him by a GlobalWare stockholder.

97.    No GlobalWare stockholder has filed an action against Bartlett nor threatened litigation in a serious manner.  Bartlett's claim for defense and indemnification is not ripe.

98.    Even if Bartlett's claim was ripe, under Delaware law, GlobalWare has no obligation to defend or indemnify Bartlett.  Bartlett has failed to act in good faith and in a manner reasonably believed to have been in or not opposed to GlobalWare's best interests.

99.    Pursuant to Section 7 of the Employment Agreement, Bartlett agreed to be bound by a non-competition clause which provides,

> During the Term and for a period of one (1) year after termination of his employment with the Company for any reason whatsoever (the "Restricted Period"), Bartlett *shall not*, directly or indirectly, be (as a principal, partner, director, officer, agent, employee, consultant or otherwise) engaged in or financially interested *in any business which is engaged in competition with the Company in the computer hardware/software documentation, or financial or educational printing business, or any other businesses the Company is engaged in at the time of the termination of Bartlett's employment*, in any State, country or other jurisdiction in which the Company is engaged in business or have plans to engage in business at the time of such termination, nor shall Bartlett solicit or attempt to solicit in any Company Jurisdiction any customer or supplier transacting business with the Company at any time during the eighteen (18) months preceding Bartlett's termination in connection with any such business. . . . *Bartlett's obligations under this Section 7 shall become null and void if the Company fails to comply in all material respects with its obligations under this Agreement, including without limitation the Company's obligations set forth in Sections 1 and 5 hereof.*

(emphasis added)

100.   Section 7 of the Employment Agreement provides that the non-competition clause becomes null and void *only* if GlobalWare "fails to comply *in all material respects*" with its obligations under the Employment Agreement.

101.   Because GlobalWare has complied with all of its obligations under the Employment Agreement "*in all material respects*" Bartlett is bound by Section 7 of the Employment Agreement and Section 7 remains in full force and effect.

## COUNT I
### (Breach of Fiduciary Duty)

102.   GlobalWare incorporates by this reference the allegations of all the preceding paragraphs of this Counterclaim as if fully set forth herein.

103.   As GlobalWare's President and Chief Executive Officer, Bartlett held a position of trust and confidence with GlobalWare.

104.   Bartlett owed fiduciary duties of good faith, fairness, care, loyalty and integrity to GlobalWare and its stockholders.

105.   By his actions, including those alleged herein, Bartlett has violated his fiduciary duties to GlobalWare and its stockholders.

106.   As a direct and proximate result of Bartlett's breach of his fiduciary duties to GlobalWare and its stockholders, GlobalWare has suffered, and continues to suffer, substantial harm for which Bartlett is liable in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

107.   GlobalWare incorporates by this reference the allegations of all the preceding paragraphs of this Counterclaim as if fully set forth herein.

108.    In breach of Section 4 of the Employment Agreement, Bartlett has failed to provide GlobalWare with accurate information with respect to GlobalWare's business.

109.    Also in breach of Section 4 of the Employment Agreement, Bartlett has failed to provide GlobalWare with his knowledge of the financial improprieties he directed, caused, facilitated and/or permitted.

110.    Bartlett's actions and omissions constitute material breaches of the Employment Agreement.

111.    GlobalWare has materially complied with all of its obligations under the Employment Agreement.

112.    As a direct and proximate result of Bartlett's breach of the Employment Agreement, GlobalWare has suffered, and continues to suffer, substantial harm for which Bartlett is liable in an amount to be determined at trial.

## COUNT III
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

113.    GlobalWare incorporates by this reference the allegations of all the preceding paragraphs of this Counterclaim as if fully set forth herein.

114.    Under the laws of the State of Delaware an implied covenant of good faith and fair dealing is present in every contract.  The covenant provides, among other things, that neither party will take any action that destroys the ability of the other party to enjoy the benefit of the contractual bargain.

115.    Bartlett interfered with GlobalWare's ability to enjoy the fruits of the Employment Agreement by his failure to provide GlobalWare with accurate information about GlobalWare's business and by his failure to inform GlobalWare of his own self-dealing actions.

116.   Bartlett's conduct as set forth herein constitutes one or more material breaches of the implied covenant of good faith and fair dealing that is present in every contract.

117.   As a direct and proximate result of Bartlett's breach of the covenant of good faith and fair dealing, GlobalWare has suffered, and continues to suffer, substantial harm for which Bartlett is liable in an amount to be determined at trial.

### COUNT IV
### (Fraud)

118.   GlobalWare incorporates by this reference the allegations of all the preceding paragraphs of this Counterclaim as if fully set forth herein.

119.   Upon information and belief, Bartlett made false and material misrepresentations to GlobalWare including without limitation; (i) submitting personal expenses for reimbursement; (ii) charging GlobalWare for personal favors for his friends and family; (iii) misdirecting corporate funds; and (iv) directing, causing, facilitating and/or permitting GlobalWare to commit numerous accounting irregularities to his benefit and GlobalWare's detriment.

120.   Through his self-dealing conduct and deceit, Bartlett fraudulently induced GlobalWare to enter into the Employment Agreement.  If GlobalWare's executive team had been aware of Bartlett's misconduct, it would not have negotiated nor executed the Employment Agreement on GlobalWare's behalf.

121.   Bartlett made such false and material misrepresentations with the purpose and intent that GlobalWare would rely and/or act upon such misrepresentations.

122.   GlobalWare reasonably relied upon such misrepresentations to its detriment.

123.   As a direct and proximate result of Bartlett's fraudulent conduct, GlobalWare has suffered, and continues to suffer, substantial harm for which Bartlett is liable in an amount to be determined at trial.

## COUNT V
### (Action for Declaratory Relief M.G.L. c. 231A)

124.   GlobalWare incorporates by this reference the allegations of all the preceding paragraphs of this Counterclaim as if fully set forth herein.

125.   As set forth in the various demands made by the parties hereto and in the facts alleged above, there is an actual controversy between Bartlett and GlobalWare concerning the parties' compliance with their obligations under the Employment Agreement.

126.   As set forth in the facts alleged above, GlobalWare has complied in all material aspects with its obligations to pay Bartlett monies due pursuant to the Employment Agreement.

127.   As set forth in the facts alleged above, Bartlett is not entitled to indemnification from GlobalWare for any judgment rendered against him in this or any related action, nor for any other liabilities or expenses (including legal fees) incurred by him in connection therewith.  In committing the wrongful acts and omissions alleged herein, Bartlett has not acted in good faith and in a manner reasonably believed to have been in or not opposed to GlobalWare's best interests.

128.   As set forth in the allegations above, Bartlett has materially breached his obligations under the Employment Agreement.

129.   GlobalWare seeks a declaration that: (i) GlobalWare has materially performed its obligations under the Employment Agreement; (ii) GlobalWare has no obligation to defend or indemnify Bartlett to the extent that he has acted in bad faith or otherwise not in accordance with Delaware law; and (iii) pursuant to Section 7 of the Employment Agreement, Bartlett is bound by the non-competition Clause contained therein.

WHEREFORE, GlobalWare asks that this Court grant it the following relief:

1.    Enter Judgment for GlobalWare on its claim of breach of fiduciary duty and award GlobalWare the damages directly and proximately caused thereby;

2.    Enter Judgment for GlobalWare on its claim of breach of contract and award GlobalWare the damages directly and proximately caused thereby;

3.    Enter Judgment for GlobalWare on its claim of breach of the implied covenant of good faith and fair dealing and award GlobalWare the damages directly and proximately caused thereby;

4.    Enter Judgment for GlobalWare on its claim of fraud and award GlobalWare the damages directly and proximately caused thereby;

5.    Enter judgment for GlobalWare against Bartlett on its claim for Declaratory Judgment that: (i) GlobalWare has performed its obligations under the Employment Agreement; (ii) GlobalWare has no obligation to defend or indemnify Bartlett to the extent that he has acted in bad faith or otherwise not in accordance with Delaware law; and (iii) pursuant to Section 7 of the Employment Agreement, Bartlett is bound by the Non-Competition Clause contained therein;

6.    Grant GlobalWare attorneys' fees and costs; and

7.    Grant GlobalWare such other and further relief as is just and equitable.

## JURY DEMAND

GlobalWare demands trial by jury on all issues and claims so triable.

BOS1294977.1

Respectfully submitted,

GLOBALWARE SOLUTIONS, INC.

By its attorneys,

Melissa Bayer Tearney (BBO No. 558612)
W. Scott O'Connell (BBO No. 559669)
Courtney Worcester (BBO No. 643180)
NIXON PEABODY LLP
101 Federal Street
Boston, MA  02110
(617) 345-1000

Dated:  August 18, 2003

## CERTIFICATE OF SERVICE

I, Melissa Bayer Tearney, do hereby certify that the above GlobalWare Solutions, Inc.'s Answer and Counterclaim and Jury Demand were served by hand delivery upon Thomas S. Fitzpatrick, Esquire, Davis Malm & D'Agostine P.C., One Boston Place, Boston, MA 02108, and this 18th day of August, 2003.

Melissa Bayer Tearney